EXHIBIT 1

AGREEMENT made as of the 1st day of March, 1968, by and between CHESS PRODUCING CORPORATION of 320 East 21st Street, Chicago, Illinois (hereinafter referred to as "Company") and Charles Stepney of 9630 South Forest Avenue, Chicago, Illinois 60628 (hereinafter referred to as "Producer").

1. (A) Company hereby employs Producer as a producer for the purpose of producing master recordings from which phonograph records can be manufactured, and for such other purposes as are normally incidental thereto, and Producer hereby accepts such employment upon all of the terms and conditions of this agreement.

(B) During the initial term and option period of this agreement (and all extensions or renewals thereof), Producer shall not perform the services specified in sub-division (A) of this paragraph for himself or any person or business entity other than Company.

(C) Producer acknowledges that the services to be rendered by him hereunder are unique and extraordinary and that the breach of this agreement by Producer will cause irreparable damage to Company and will justify Company's application for equitable relief in addition to all available remedies.

2. (A) Producer will render services at recording sessions scheduled at times and places designated by Company. Company shall select the musical compositions or other material to be performed at such sessions and shall also determine the number and identity of the musicians, vocalists and other performers to be recorded at such sessions.

(B) All master recordings produced hereunder, as well as all performances embodied therein and all phonograph records derived therefrom will be the exclusive property of Company free of any claim whatsoever by Producer or by anyone deriving rights from

Producer. Without limiting the generality of the foregoing, Company shall have the exclusive right throughout the world in its sole discretion and at any time to manufacture, advertise, sell, lease, license, distribute or otherwise exploit such property and to authorize others to do so or to refrain from doing so. Phonograph records manufactured from master recordings produced hereunder may be distributed and offered for sale under such trademarks, trade names or labels and by such distributors and licensees as Company alone may determine.

(C) All costs and expenses which are incurred by Company by reason of Producer's failure to appear or tardiness in appearing at a recording session scheduled by Company shall be paid by the Producer to the Company as Producer's absolute liability without reference to any royalties due and payable to Producer, and Company, at its option, may deduct such costs or expenses from such royalties or other sums due to Producer.

3. Prior to each recording session schedule hereunder Producer shall prepare and submit to Company for Company's approval a proposed budget which shall specify the proposed cost of such recording session, including without limitation the costs of arrangers, musicians, copyists, vocalists, payments due to any union pension and welfare fund, payroll and employment taxes and recording costs (such as studio time, equipment and personnel charges and mastering and waxing costs), and Company shall pay to those to whom such sums are due all costs specified in the finally approved budget. All final decisions with respect to the costs specified in such budget shall be made by Company after consultation with Producer. In the event the total costs of such session exceed the total amount set forth in the finally approved budget, Company shall pay such additional costs to those to whom such sums are due and shall recoup such excess amount from the compensation payable to Producer pursuant to this agreement or from any other

compensation payable to Producer by Company or any of its subsidiaries or affiliates (including Chevis Music Inc.).

4. Company agrees to pay to Producer in consideration of the services to be rendered by Producer hereunder:

(A)(i) A royalty of Three Percent (3%) of the wholesale price (exclusive of all sales and excise taxes and duties, and less the portion of such price allocated by the Company to containers or packaging) for ninety percent of all 33 1/3 rpm long playing phonograph records (exclusive of pre-record tapes) sold within the United States under the authority of Company, on both sides of which is embodied only performances produced hereunder, and which are paid for and not subject to return; and one-half (1/2) of such royalty with respect to corresponding pre-recorded tapes (contained in cartridges or otherwise) sold within the United States under the authority of Company, embodying performances recorded hereunder, and which are paid for and not subject to return.

(B) With respect to phonograph records sold outside of the United States under the authority of Company which contain performances produced hereunder, Company will pay to Producer a royalty equal to one-half (1/2) of the royalties specified in sub-division (A) of this paragraph. Such royalties shall be paid at the same rate of exchange as Company is paid (where applicable) provided, however, that royalties on such sales shall not be due and payable until payment therefor has been received by Company in the United States of America.

(ii) A royalty of One and One-Half Cents (1 1/2¢) for each 45 rpm single phonograph record over twenty-five thousand (25,000) sold within the United States under the

authority of Company on both sides of which is embodied only performances produced hereunder, and which are paid for and not subject to return.

(C)(i) In the event that any performance produced hereunder is coupled on a phonograph record with any performance produced by a party other than Producer, it is agreed that as to such record, Producer shall receive that proportion of the royalties payable to Producer (as herein provided) as the number of performances produced hereunder embodied on such record bears to the total number of performances embodied thereon.

(ii) In the event that any master recording produced hereunder is produced with the assistance of another producer to whom Company is obligated to pay a royalty, it is agreed that the royalty payable to Producer (as herein provided) with respect to phonograph records made from such master recording, shall be multiplied by a fraction the numerator of which shall be one (1) and the denominator of which shall be the total number of producers (including Producer) having assisted in producing the performances embodied therein.

(D) In the event that phonograph records embodying any of the performances produced hereunder are sold through any direct mail-order operation, including but not limited to record clubs, the royalties payable to Producer shall be one-half (1/2) of the royalties otherwise due and payable as herein provided. No royalty shall be payable to Producer with respect to phonograph records distributed to subscribers of such operation by reason of the purchase of a specified number of phonograph records or by reason of distributions to subscribers of "bonus" or "free" records.

(E) No royalties shall be payable on "disc jockey" or "promotional copies" of records distributed for promotional purposes, and no royalties shall be payable with respect to any phonograph records for which Company does not receive payment. No royalties shall be payable on phonograph records which are sold as distress merchandise or which are sold by Company for less than Fifty Percent (50%) of Company's full wholesale price therefor (as such price is established from time to time by Company prior to the calculation of any discounts, allowances or commissions deductible therefrom).

(F) No royalties shall be payable to Producer until Company has fully recouped all indirect and direct costs involved in producing the master recordings produced hereunder (including without limitation the costs specified in the approved budget) and all non-returnable advance payments and all other charges against Producer's royalties pursuant to this agreement or any other agreement between the parties or between Producer and any subsidiary or affiliate of Company's (including without limitation Chevis Music, Inc.).

(G) From the royalties payable to Producer hereunder Company shall have the right to withhold a reasonable reserve which in no event shall exceed Twenty Percent (20%) of the total amount then payable to Producer. Such reserve shall not be withheld for a period in excess of twelve (12) months.

5. Each week during the term of this agreement (as such term may be extended) Company shall pay to Producer in addition to the royalties specified in paragraph 4 of this agreement, One Hundred Dollars ($100.00), which sums shall be recoupable by Company from the royalties specified in paragraph 4 of this agreement and from any other compensation payable to Producer by Company or any of its subsidiaries or affiliates (including Chevis Music Inc.).

6. (A) The initial term of this agreement shall be one (1) year from the date hereof.

(B) Company shall have an irrevocable option to extend the term of this agreement for one (1) additional period of one (1) year. Such option shall be exercised by Company in a written notice mailed to the Producer no less than ten (10) days before expiration of the initial term of this agreement. All terms and conditions herein contained shall be applicable during such option period.

(C) Company shall have the right to terminate this agreement upon thirty (30) days written notice to Producer.

7. Royalties hereinstated to be due and payable to Producer, less non-returnable advances, charges or expenses properly deducted therefrom, will be computed for the preceding six (6) calendar month period within forty-five (45) days after June 30 and December 31 of each year so long as phonograph records embodying performances produced hereunder are sold and paid for. Such royalties will be paid to Producer within such forty-five (45) day period and will be accompanied by appropriate royalty statements. All royalty statements and all other accounts rendered by Company to Producer will be binding upon Producer and not subject to any objections by Producer for any reason unless specific objection in writing, stating the basis thereof, is received by Company within one (1) year from the date rendered in which event such statements shall be binding in all respects except for those specifically stated in such written objections. All royalty statements, payments, notices and correspondence to Producer shall be sent to Producer at the address indicated above unless prior written notice to the contrary is received from Producer by Company.

8. Company shall have the right to use and permit others to use Producer's name, likeness, biographical material and facsimile signature for advertising and trade purposes in connection with the

manufacture, distribution, sale and exploitation of all phonograph records embodying performances produced hereunder, no matter when or where manufactured, distributed, sold or exploited.

9. Producer acknowledges that Producer is engaged in the business of musical entertainment. Producer hereby represents and warrants that Producer is free to enter into this agreement and that Producer is under no disability, restriction, or prohibition which will interfere in any manner with Producer's full compliance with and performance under this agreement. In the event that Producer is a minor, Producer agrees to cause Producer's parent or guardian to execute the consent annexed hereto as Exhibit "A". Producer agrees to indemnify, save and hold Company harmless from any loss, damage or expense (including attorneys' fees) arising out of or connected with any claim by any third party which is inconsistent with the warranties, covenants or representations made by Producer in this agreement.

10. Company, in its sole discretion, may assign this agreement or any of Company's rights hereunder to any other person, firm or corporation.

11. Producer agrees and guarantees that with respect to any musical composition created in whole or in part by Producer, or owned or controlled in whole or in part by Producer, either alone or in collaboration with others, and which is recorded at a recording session produced hereunder, the copyright proprietor thereof will (at Company's request) grant to Company or its designee a mechanical license authorizing Company or its designee to manufacture and sell phonograph records embodying such musical composition as performed at such session upon payment of a royalty which shall not exceed One and One-half Cents (1 1/2¢) on ninety percent (90%) of all such phonograph records manufactured and sold by the Company.(*) In the event such a license is not granted to Company on the aforesaid

Company or its designee pays royalties to such a proprietor in excess of the amount specified in the preceding sentence, Producer agrees that the difference between such specified royalties and the royalties paid by Company or its designee may be deducted from the royalties agreed to be paid Producer hereunder.

12. As a condition precedent to any assertion by the Company or Producer that the other is in default in performing any obligation contained herein, the party alleging the default must advise the other in writing of the specific facts upon which it is claimed that the other is in default and of the specific obligation which it is claimed has been breached, and said other party shall be allowed a period of fifteen (15) days after receipt of such written notice within which to cure such default. The parties agree that no breach of any obligation shall be deemed to be incurable during such fifteen (15) day period.

13. For the purpose of this agreement:

(A) "Master recording", whenever referred to herein is intended to mean any original recording of sound, whether on magnetic recording tape or wire, lacquer or wax disc, or any other substance or material, whether now known or unknown, which is used in the manufacture of phonograph records.

(B) "Phonograph record", "record" or "phonograph recording", whenever referred to is intended to mean any and all objects manufactured in whole or in part from master recordings and which are intended to reproduce sound, including but not limited to wire, disc, film, cylinder and (except where otherwise stated) tape, whether embodying sound alone or sound synchronized with visual images, e.g. audio visual devices.

14. This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and no modi-

fication, amendment, waiver, termination or discharge of this agreement or any provision thereof shall be binding upon Company unless confirmed by a written instrument signed by an officer of the Company. No waiver of any provision of or any default under this agreement shall affect Company's right thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar. The validity, construction and effect of this agreement, and all extensions and modifications thereof, shall be construed in accordance with the Law of the State of New York applicable to agreements wholly to be performed therein.

IN WITNESS WHEREOF, the parties hereunto have caused this agreement to be executed as of the date first indicated above.

CHESS PRODUCING CORPORATION

By: _____
Marshall Chess

By: _____
Charles Stepney